IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RICHARD MAYER, | |
| Plaintiff, | **8:23CV225** |
| vs. | |
| UNION PACIFIC RAILROAD CO., | **MEMORANDUM AND ORDER** |
| Defendant. | |

Before the Court is Union Pacific Railroad Company's (U.P.'s) Motion for Judgment on the Pleadings (Filing No. 53), Motion for Judicial Notice (Filing No. 55); Motion for Summary Judgment (Filing No. 57), and Richard Mayer's Motion for Judicial Notice (Filing No. 80).[1]

This is an Americans with Disabilities Act (ADA) case. Richard Mayer worked for U.P. for over two decades as an engineer. Mayer suffers from a medical condition (cardiomyopathy) treated with an implantable cardioverter defibrillator (ICD). He alleges U.P. imposed career ending work restrictions because of this medical condition.

---

[1] Mayer and U.P., moved for judicial notice of certain facts in connection with U.P.'s Motion for Judgment on the Pleadings. Filing No. 55; *see Von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139, 1143 (8th Cir. 2019) (noting a Court may consider matters subject to judicial notice on a 12(c) motion). Because the Court converted the Motion for Judgment on the Pleadings to a Motion for Summary Judgment, it is free to consider the materials in question, even if they are not subject to judicial notice. So the Court denies these motions as moot.

Summary judgment is not appropriate on Mayer's disability discrimination claim because: (1) Mayer's statute of limitations was tolled during the pendency of a prior ADA class action against U.P., (2) the record shows disputes of material fact on the elements of Mayer's ADA claim, and (3) a reasonable jury could conclude U.P.'s direct threat determination was not "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1062 (8th Cir. 2024). More specifically, under the applicable medical guidelines, Mayer's heart condition alone would not support denial of certification. And medical research postdating the promulgation of the applicable medical guidelines but predating U.P.'s decision suggests the risk of syncope from an accidental shock is lower than previously believed. So, this case will go to the jury on Mayer's disparate treatment claim.

Mayer's unlawful screening claim under 42 U.S.C. § 12112(b)(6) is underdeveloped by the Parties. On this record and argument from the parties, U.P. is not entitled to summary judgment.

## BACKGROUND

This case treads well-worn ground in this district: a former U.P. employee alleges U.P. imposed work restrictions that prevented him from working his safety sensitive job because of a medical condition. Here, the job is a train engineer, and the medical condition is cardiomyopathy with an ICD.

### A. Mayer's Heart Condition.

For many years, Mayer suffered from a medical condition called cardiomyopathy. Filing No. 61-1 at 6, Mayer Dep. at 81:6-9. Cardiomyopathy is a condition that weakens

2

the muscles of the heart and makes it more difficult for the heart to pump blood to the rest of the body. Filing No. 61-2 at 3, Esterbrooks Dep. at 11:13-17. This is quantified using a measure called the ejection fraction -- the percentage of blood in the left ventricle that is pumped out of the heart each time it beats. Filing No. 61-14 at 3. A heart with cardiomyopathy has an ejection fraction below 50%, meaning only 50% of the blood leaves the left ventricle and brings oxygen to the rest of the body. *Id.* Heart failure – the clinical manifestation of cardiomyopathy – is characterized by shortness of breath, chest paints, edema, and heart palpitations. Filing No. 70-7 at 11, 15, Esterbrooks Dep. at 37:7-18, 50:2-6. A patient with heart failure is more likely to die suddenly. Filing No. 61-14 at 304. Specifically, a diseased heart can fall out of rhythm and deprive other organs of needed oxygen. *Id.*

Mayer was initially diagnosed with cardiomyopathy in 1999. Filing No. 61-1 at 6. Mayer Dep. at 81:6-9. His doctors believe this condition was caused by excessive alcohol use. *Id.* at 7, Mayer Dep. at 82:20-23. In 1999, Mayer's ejection fraction was 20%. Filing No. 61-13 at 3. In 2005, Mayer's cardiologists measured his ejection fraction at 25% to 30%. Filing No. 70-10 at 6. While Mayer had not suffered a dangerous arrhythmia in 2005, his doctors were concerned that he would in the future. Filing No. 70-6 at 8, Lowes Dep. at 23:8-22.

Concerned about Mayer's risk for sudden cardiac death, his cardiologists installed an ICD. Filing No. 61-14 at 4. An ICD is a medical device that sits in the chest and acts as a combination pacemaker/defibrillator. Filing No. 70-1 at 9, Mayer Dep. at 27:18-21. The ICD monitors the heartbeat. Filing No. 70-7 at 4-5, Esterbrooks Dep. at 9:22-10:6. If the heart gets dangerously out of rhythm the ICD issues a powerful electrical shock –

ideally restarting a normal rhythm. *Id.* An ICD presents some risks of its own. Studies have shown that an ICDs can malfunction, producing an inappropriate and disabling shock. Filing No. 61-14 at 4.

Since his ICD was implanted, Mayer has not received a shock from his device. *Id.* at 3. While he experienced arrythmias during that time, none triggered the ICD. Filing No. 70-7 at 12, Esterbrooks Dep. at 39:8-22. During that period, he cut down on drinking (Filing No. 70-2 at 24, Mayer Dep. at 86:4-10) and his cardiomyopathy improved. Filing No. 70-10 at 9 ("[T]he 12/31/1999 ejection fraction (EF) of 25 to 30%, had improved by 12/02/2010 to an ejection fraction (EF) of 35 to 40%"). Specifically, after routine maintenance on his ICD in 2010, doctors measured Mayer's ejection fraction at 40%. Filing No. 61-3 at 5. In 2014, his ejection fraction was measured at 45% to 50%. Filing No. 61-10 at 2. Between 2018 and 2023, his ejection fraction was generally stable in the 40% to 45% range. See Filing No. 69 at 21, ¶ 145 (collecting evidence). While below average, this number represents a substantial improvement from 2005. Mayer's current ejection fraction would not qualify him for implantation of an ICD today. Filing No. 70-10 at 18; Filing No. 61-17 at 1; Filing No. 70-7 at14, Esterbrooks Dep. at 48:25-49:7.

Today, Mayer's cardiomyopathy does not have a significant impact on his daily life. He works, walks several miles a day, plays softball, golfs, and bowls. He does not regard himself as disabled. Filing No. 61-1 at 13, Mayer Dep. at 162:9-21.

### B. Mayer's Employment with U.P.

In parallel, Mayer worked for U.P. starting in 1994. Filing No. 70-2 at 7, Mayer Dep. at 18:1-3. During that time, he worked as a brakeman, conductor, switchman, fireman, and holster. *Id.* at 13, Mayer Dep. at 42:9-46:2. His final job at U.P. was as an engineer.

Basically, the engineer drives the train. Filing No. 61-1 at 2, Mayer Dep. at 63:10-64:25. At the start of a route, Mayer would check the breaks and start the train. *Id.* During the route, Mayer handled the train and kept watch for any dangers on the track. If he noticed an issue – such as a truck or farm animal stopped in the tracks – Mayer was responsible for pulling the emergency break and stopping the train. Id. at 20-21, Mayer Dep. at 70:2-75:7. An emergency stop is not a theoretical possibility. Mayer estimated that he performed around a dozen emergency stops during his time as an engineer, including incidents in which people were standing in or crossing the tracks. *Id.* at 20, Mayer Dep. at 71:4-12. Finally, at the end of the train's route, Mayer was responsible for breaking the train. *Id.* at 2, Mayer Dep. at 63:10-64:25. Overall, Mayer was "in charge of the train" and was responsible for preventing derailments and damage people, cargo, or property. *Id.* at 21, Mayer Dep. at 74:14-18 ("You know if I do something wrong, derail a hundred cars or ten cars, you know, that's on me . . . ."). Mayer agrees his job was safety critical. *Id.*

While on the train route, Mayer did not engage in physically strenuous work. Filing No. 70-1 at 4. He remained seated while the train was in motion. *Id.* at 3-4. He was joined in the cabin by a conductor. *Id.* at 1. The conductor has her own emergency brake that could be triggered in the event of an emergency. *Id.*

During his employment, Mayer kept U.P. appraised of his cardiac situation. See Filing No. 61-3 at 1-13. Specifically, in 2010 Mayer underwent an operation to repair his ICD and took time off from U.P.. *Id.* Before he returned to work, he underwent a fitness for duty evaluation. *Id.* at 7. Based on his medical records, U.P.'s chief medical officer cleared him to return to work. *Id.* As a condition of returning to work, Mayer was required

to provide updated records annually. *Id.* U.P. continued to clear him for work until 2017.[2] *Id.* at 7-13.

### C. U.P. Removes Mayer from Duty, Citing Risk of Future Cardiac Episodes.

In 2017, U.P. revisited Mayer's case and placed him on light duty pending a new fitness for duty evaluation. Filing No. 61-5.

U.P.'s decision was part of a large-scale reexamination of its fitness for duty policies. See generally Filing No. 60-2. Specifically, U.P. began to rely on Federal Motor Carrier Safety Administration (FMCSA) standards for commercial drivers. In the guidance, the agency reviewed the medical literature and offered recommendations on how to account for the risk of certain common medical conditions, when deciding whether to certify commercial drivers. *Id.* at 4-5. Two provisions of the FMCSA guidelines are relevant here. One, the guidelines recommend against certification for drivers with ICDs. Filing No. 60-5 at 5. Specifically, the agency notes "ICDs treat but do not prevent arrhythmias. Therefore, the driver remains at risk for syncope. The management of the underlying disease is not effective enough for the driver to meet cardiovascular qualification requirements." *Id.* Two, the guidelines recommend against certification of drivers with dilated cardiomyopathy under some circumstances. More specifically, the guidelines recommend against certification if: (1) the driver has non-sustained ventricle tachycardia and an ejection fraction of 40% or less, (2) sustained ventricle tachycardia, or (3) syncope

---

[2] In 2013, concerned about electromagnetic interference with Mayer's ICD, U.P. imposed work restrictions against working around EMF sources. Filing No. 61-3 at 11. These restrictions did not impact Mayer's ability to work as an engineer. Mayer does not challenge the 2013 restrictions.

from an arrythmia. Filing No. 60-5 at 7. At the time of Mayer's fitness for duty process, the handbook had not been updated since 2014.[3]

Against the backdrop of that guidance, Dr. Holland performed a new fitness for duty examination. Filing No. 61-5. Specifically, U.P. requested a "[c]opy of diagnostic study reports including lab work (cardiac enzymes), chest x-ray, EKG, echocardiogram, CT scan, MRI, cardiac stress testing, etc. from the past 3 years"; and a "[c]opy of physician clinic notes from the past 3 years from the provider treating you for this condition." *Id*. Mayer provided these materials. *See* Filing No. 61-6. Dr. Holland relied on the records from Mayer's treating physicians and did not independently examine Mayer. *See generally* Filing No. 60-3 (U.P.'s medical comments history summarizing the materials relied on).

Dr. Holland provided Mayer's medical record to an outside cardiologist – Dr. Lowes – to assess whether Mayer's heart was healthy enough for Mayer to safely work as an engineer. Filing No. 61-6. Dr. Lowes opined Mayer's "current risk of sudden incapacitation given his cardiomyopathy and AICD[4] are significant. Patients with an AICD may receive a shock appropriately from their device for life threatening arrythmias. He is at risk for this due to his cardiomyopathy. Patients may also receive inappropriate shocks from their device due to inappropriate sensing or device malfunction. In either case, shocks from an AICD can suddenly incapacitate a person." Filing No. 61-9 at 2. Overall, Dr. Lowes "believe[d] that Mr. Mayer would be reasonably safe to do indoor/office work under

---

[3] In 2024, the FMCA released an updated version of the handbook. The parties did not submit it as part of the record and U.P, did not rely on it to impose work restrictions, so the Court did not consider it.
[4] Dr. Lowes is referring to Mayer's ICD.

controlled environmental conditions up to 60% of his aerobic capacity in a position where his sudden incapacitation would not impact his safety or the safety of others." *Id.*

Dr. Holland imposed permanent work restrictions. His reasoning was outlined in an August 22, 2017, Fitness for Duty Determination Memo (FFD Memo). His basis for imposing work restrictions was as follows:

**Assessment**

Mr. Mayer has received an AICD because he has a history of non-ischemic cardiomyopathy and sub-optimal left ventricular ejection fraction. Although he is reported to be stable with improved ejection fraction, based on his underlying condition he is considered to have a permanent unacceptable risk for sudden incapacitation due to a life-threatening ventricular arrhythmia or an inadvertent ICD shock.

The evidence from scientific studies shows that in any given year, a person with ICDs have about a 20% annual risk (occurrence rate) of an appropriate ICD shock because of a life-threatening ventricular arrhythmia, and another 10% risk of and inappropriate ICD shock. Both appropriate and inappropriate shocks will be associated with sudden incapacitation, and the risks for both these events pose unacceptable safety risks for a worker in a safety critical position, such as a Locomotive Engineer.

For a Locomotive Engineer or other train crew member, sudden incapacitation at work can create significant safety risks for the individual worker, co-workers, the public, property and the environment, and requires permanent work restrictions (which are given below).

There is no disagreement between Mr. Mayer's cardiologist and HMS regarding the diagnoses that are the basis of his work restrictions (i.e., history of non-ischemic cardiomyopathy and presence of an ICD). It should also be noted that Mr. Mayer's work restrictions for sudden incapacitation risk are not related to potential Electric and Magnetic Force (EMF) exposures in his job, since UPRR's work restrictions for EMF could be accommodated in his job as a Locomotive Engineer.

*Id.* at 2. Dr. Holland listed the work restrictions. *Id.* Two work restrictions – "[n]ot to operate company vehicles, on-track or mobile equipment, or fork-lifts" and "[n]ot to work on or near moving trains, freight cars or locomotives, unless protected by barriers" – were fatal to Mayer's continued employment as an engineer. *Id.*

This fact was confirmed by Mayer's supervisor who concluded that he could not perform the engineer job, even with a reasonable accommodation. Filing No. 61-11. Mayer did not return to his job as an engineer and has not worked for U.P. since.

**D. The Parties' Experts Assess Mayer's Risk Level.**

8

Both parties developed expert testimony to bolster or criticize U.P.'s decision. The Court summarizes their testimony below.

*Dr. Callans*. Dr. Callans is U.P.'s retained cardiologist. He opined that "Mr. Mayer's restriction of duty by Union Pacific was medically reasonable, consistent with the FMCSA Handbook and with current scientific and medical literature." Filing No. 61-14. He opined that Mayer's ejection fraction remained below a healthy level during the relevant period. *Id.* at 3 (indicating a healthy ejection fraction is 55% or over).[5] So, Mayer had a risk for sudden cardiac death both from his underlying heart condition and from an accidental shock from his device. *Id.* at 4. In addition, he compared an ICD shock to "getting kicked in the chest by a mule" and opined that even if an accidental shock did not knock Mayer out, it may otherwise incapacitate him. *Id.* He claims the 2014 FMCSA guidelines support U.P.'s conclusion and U.P.'s judgment was consistent with the medical literature. *Id.*

*Dr. Osbahr.* Dr. Osbahr is U.P.'s retained occupational physician who agrees with U.P.'s decision to impose work restrictions. Filing No. 61-16. He opined that Mayer's job was safety sensitive. Filing No. *Id.* at 8. He summarized the medical history discussed above. *Id.* at 2-4. Based on that medical history, he concluded that the FMCSA guidelines would not recommend certification because of his ICD. He summarized the literature in this area to conclude the ICD policy was reasonable. First, he noted that since 2002 the FMCSA has recommended no certification for drivers with ICDs. *Id.* at 5. A review in 2007, "did not find clear evidence to state that there were increased crashes from ICD placements, nor strong evidence to remove the recommendation from 2002." *Id.* at 6. In

---

[5] In part, Dr. Callans relies on a 2020 measure of Mayer's ejection faction at 35% to 40%. The Court does not find this data point especially helpful for assessing Mayer's condition in 2017 when U.P. imposed work restrictions.

2014, the FMCSA continued this recommendation, relying on studies that showed that "31% of patients with ICD[s] experienced syncope or near syncope events following an ICD shock," "10% of the studied population . . . had inappropriate shocks," and "accidental shocks are a common complication for ICD[s]." *Id.* at 6-7. Second, he summarized other countries who do not allow professional driver certification for people with ICDs. *Id.* at 7. Third, he cited to brochures indicating that ICD shocks are painful and unpleasant even when they do not cause syncope or near syncope. *Id.* at 7. Fourth, he argued Mayer's "medical condition has had elements of clear higher risk for" sudden cardiac death "due to past cardiac history." *Id.* at 8. Thus, Mayer remained at a heightened risk of a shock – appropriate or inappropriate – and that shock may be incapacitating.

*Dr. Esterbrooks.* Dr. Esterbrooks was Mayer's treating cardiologist. He testified that he "did not believe [Mayer] posed a significant risk to his personal health or posed risk to anyone else with his employment as a conductor . . . or an engineer." Filing No. 70-7 at 9, Esterbrooks Dep. 29:2-5. Specifically, he opined the clinical evidence suggested Mayer's condition was asymptomatic. *Id.* at 9, Esterbrooks Dep. 29:12-17. First, Mayer's cardiomyopathy was "clinically stable without heart failure" or a history of "ICD shocks." Second, Mayer's ejection fraction had improved, lessening the chances of an appropriate shock. *Id.* at 18, Esterbrooks Dep. at 62:4-11 ("Q. Gotcha. Do you view the fact that Mr. Mayer never received a shock from his device as being predictive of whether he's likely to receive such a shock in the future? A. I guess my assessment is what's, you know, most predictive is the ejection fraction, but I think in general somebody who's had frequent shocks are more likely to have future shocks."). And, had Mayer's ejection faction been at the 45% to 50% level, Dr. Esterbrooks would not have recommended an ICD. *Id.* at 14,

Esterbrooks Dep. at 48:25-49:7 ("Q. . . . If, when Mr. Mayer first sought treatment from you, his ejection fraction was in this neighborhood of 45 to 50 percent, would you have recommended the implantation of am ICD? A. Probably not and I'm not sure at the time I was seeing him it was the standard of care.").

*Dr. Goldstein.* Dr. Goldstein is Mayer's retrained cardiologist who opined on the risk posed by Mayer's underlying condition and ICD. Filing No. 61-17 at 1. He opined Mayer's "risk of sudden cardiac death is quite low." *Id.* Specifically, Mayer's ejection fraction improved since the time the ICD was implanted, he has never received a shock, and "[i]f . . . the etiology of [Mayer's] cardiomyopathy was secondary to alcohol intake, then with cessation and appropriate guideline-directed medical therapy, he should continue to remain stable and potentially continue to improve (as he has demonstrated over the years)." *Id.* at 2. Dr. Goldstein agreed "If [Mayer] were to be evaluated in his current state for" an ICD, "he would be deemed inappropriate for implantation due to the low risk of sudden cardiac death in this clinical setting." *Id.* at 1. "[T]he fact that at this stage he would not warrant initial implant is proof enough of the low risk of ventricular arrhythmias in this setting." *Id.* Turning to the risk of an inappropriate shock, Dr. Goldstein admitted this risk existed but pointed to a 2017 study that contradicts the medical evidence relied on by U.P. – the Watanabe study. That study, showed "the incidence of syncope (loss of consciousness) in the setting of inappropriate ICD discharges was about 0.7%." *Id.* at 2; Filing No. 70-8. This suggests that the risk form an inappropriate discharge is "negligible." Filing No. 61-17 at 2. Overall, Dr. Goldstein concluded given Mayer's improved condition and changing science on inappropriate discharge, Mayer had a "a low risk of sudden incapacitation" from ICD shocks – appropriate or inappropriate. *Id.* at 2-3.

*Dr. Trangle.* Dr. Trangle is Mayer's retained occupational physician. Dr. Trangle opined Mayer "was in a very low risk category." Filing No. 70-10 at 19. Dr. Trangle opined the risk from Mayer's underlying condition was low because Mayer "never had a syncopal episode, and he never actually had the defibrillator discharge." *Id.* at 18. Moreover, Mayer reduction of alcohol consumption corresponded to an improved ejection fraction. *Id.* Mayer's current ejection faction would not qualify him for an ICD. *Id.*

### E. Mayer Participates in the *Harris* Class Action and Files this Lawsuit.

Shortly before Mayer's employment with U.P. ended, a group of former U.P. employees filed a class action alleging U.P.'s fitness for duty program violated the ADA. *See Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 627 (D. Neb. 2019) *rev'd* 953 F.3d 1030 (8th Cir. 2020). Relevant here, the class claims included disparate treatment under 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6). In discovery, U.P. produced a list of "7,723 current and former employees" who had undergone a fitness for duty evaluation that the Court treated as a "class list." *Id.* at 627. Mayer was listed in this document. Filing No. 80-1 at 32 (line 1581). The *Harris* plaintiffs moved for class certification and submitted "declarations form 44 class members who have experienced the discrimination alleged." *Id.* at 625. Mayer was one of the declarants. *Id.* at 625 n.3. In his declaration, Mayer described his heart condition, his ICD, his decade of service without incident, and that "Dr. Holland . . . removed me from my job because of my defibrillator." Filing No. 80-2 at 97-99. At least one other declarant asserted an ICD claim. On February 5, 2019, Court certified a class of "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014, until the final resolution of this action." *Harris*, 329 F.R.D. at 628. In doing so, it found that

the declarations from employees – including the ICD plaintiffs – were typical and representative of the class. *Id.* at 625. On March 24, 2020, the Eighth Circuit revered, finding that individual issues predominated over class-wide issues. 953 F.3d 1030.

Mayer filed a charge with the EEOC on May 1, 2020. He filed this lawsuit on May 26, 2023, alleging disparate treatment under 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6) – i.e., that U.P. imposed work restriction because of his disability and used a medical standard that "screened out" persons with disabilities.[6] Filing No. 1. The Court has jurisdiction under 28 U.S.C. § 1331 because Mayer's claims arise under the ADA, a federal statute.

## LEGAL STANDARD

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[6] U.P.'s focuses on whether Mayer timely filed with the EEOC not whether he timely filed this lawsuit. The Court takes the same approach.

13

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 323).   If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'"   *Id.* (*quoting Celotex Corp.*, 477 U.S. at 324).   A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).   "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).   If "reasonable minds could differ as to the import of the evidence**,"** summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

Before turning to the merits, a brief note on procedure. U.P. raised the statute of limitations in a Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c). On a rule 12(c) Motion the Court is generally confined to the pleadings, materials necessarily embraced by the pleadings, and materials properly subject to judicial notice. *Von Kaenel,* 943 F.3d at 1143. If the Court needs to consider other materials, it has the option of

14

converting to a Motion for Summary Judgment. Fed. R. Civ. P. 12(d). That is the course the Court took. As discussed below, the Eighth Circuit's tolling cases arising from the *Harris* class action turn on materials submitted in the underlying class litigation – such as the class list and declarations submitted by the named plaintiffs – that fit uneasily with the limitations considering on extra-pleading materials on a 12(c) motion. So, in the future, this type of statute of limitation argument is best raised on a Motion for Summary Judgment under Fed. R. Civ. P. 56.

## DISCUSSION

### A. Statute of Limitations and *American Pipe* Tolling

U.P. argues Mayer's claim is untimely. Filing No. 66. That contention is foreclosed by the Eighth Circuit's decision in *DeGeer v. Union Pac. R.R. Co.*, which rejected the same argument under analogous circumstances arising from the decertified *Harris* class action. *See* 113 F.4th 1035 (8th Cir. 2024) *cert. denied* 145 S. Ct. 1426 (2025).

Mayer's claim is untimely without tolling. An ADA plaintiff must file a charge with the EEOC within 300 days of the alleged act of discrimination. 42 U.S.C. § 2000e-5(e)(1). Here, Mayer was removed from the engineer position on August 24, 2017. So, without tolling, his deadline to file with the EEOC lapsed in 2018. So, the Court turns to whether class action tolling applies.

### 1. Legal Framework

In a class action, the named plaintiff represents and litigates on behalf of other similar parties. Because a putative class member's claim is part of the class action, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted

to continue as a class action." *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974). "The *American Pipe* tolling rule is 'grounded in the traditional equitable powers of the judiciary,'" "furthers the efficiency purpose of class actions by disincentivizing plaintiffs wary of an adverse certification decision from filing needless protective suits," and "serves the reliance interests that statutes of limitations aim to protect." *DeGeer*, 113 F.4th at 1038 (quoting *Cal. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 509 (2017)). As such, "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983).

Usually, tolling ends when the district court denies class certification or circuit court reverses the district court's grant of class certification. *DeGeer*, 113 F.4th at 1038. But sometimes the district court certifies a narrowed class definition and "kick[s]" the plaintiff "out of the class," thereby ending the tolling period. *Id.* 1039. But the nuances of a class definition "turns on the kinds of subtle distinctions in language that are fodder for lawyers and quicksand for laymen" *Id.* at 40. And "*American Pipe* does not require bystander plaintiffs like [Mayer] 'to follow the class action closely, looking for any change in the class definition and carefully parsing what it might mean.'" *Id.* at 1041 (*quoting DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1099 (9th Cir. 2024)). So, the narrowed class definition must "unambiguously exclude" Mayer to end tolling. *Id.* at 1039, 1040.

### 2. Mayer is Entitled to *American Pipe* Tolling.

The *Harris* class definition did not "unambiguously exclude" Mayer. *DeGeer* controls. *Id.* Mayer, like DeGeer, is on a list produced by Union Pacific that the Court referred to as a "class list" of employees that had undergone fitness for duty review based

16

on certain medical conditions. *Compare* DeGeer, 113 F.4th at 1040 *with* Filing No. 80-1 at 32. Mayer, like DeGeer, submitted a declaration about his experience in support of class certification. *Compare DeGeer,* 113 F.4th at 1040 *with* Filing No. 80-2 at 97-99. Relying on these materials the Court "certified the class, finding typicality and adequacy of representation." *DeGeer*, 113 F.4th at 1040. Thus, the Court "considered [Mayer] a member of the class it certified, so tolling applies." *Id.*

### 3. U.P.'s Arguments

U.P. argues *American Pipe* tolling does not apply for two reasons: (1) Mayer did not suffer a "reportable health event" and thus fell outside the class, and (2) Mayer's claims are different than the claims asserted by the class. Neither persuade.

*First*, U.P. argues Mayer nevertheless falls outside the class that was certified because his heart condition was an old illness, not a new reportable health event. Filing No. 66. The Court understands U.P.'s point: there appears to be some ambiguity about the interplay between the definition of reportable health event in U.P.'s medical rules and the class definition keying of the class period to the date of the fitness for duty evaluation. Both sides raise good arguments of how best to read the class definition. Ultimately, like the Eighth Circuit in *DeGeer*, the Court need not decide who has the better of the argument. *Id.* at 1041; *see also Hess v. Union Pac. R.R. Co.*, 2025 U.S. App. LEXIS 14439 at *6 (8th Cir. June 12, 2025) (same). "Whether or not the Harris district court should have found that the narrowed definition excluded plaintiffs like [Mayer], no one – not the district court, not the named plaintiffs, not [Mayer], not even Union Pacific – thought that the court did." *Id.* "Statutory limitation periods are not 'trap[s] for the unwary.'" *Id.* Mayer has diligently pursued his claims and U.P. has been on notice since at least 2019. Indeed,

"[c]hallenging certification of what it called a 'sprawling' and 'diverse' class, it pointed to the 'personal stories of the 44 declarants' as justification for reversal because they revealed different triggering events for the fitness-for-duty evaluations and a "broad[] universe" of conditions, including" heart disease. *Id.* So, any ambiguities in the class definition do not affect the application of *American Pipe* tolling.

*Second*, for the first time in its reply brief,[7] U.P. argued that *American Pipe* tolling is inapplicable because Mayer brings different claims than the class claims at issue. Filing No. 81. Certainly, *American Pipe* tolling only applies to claims asserted by the class. *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 888 (8th Cir. 2015). This makes sense. Upon certification, the class steps into the shoes of the individual plaintiff, so if the class fails to assert a claim nothing hits pause on the statute of limitations. *Id. Zarecor* illustrates this concept. There, *American Pipe* tolling did not apply because the federal securities law claims in the class action did not match the state law fraud claims in the new case and "[a] class action does not notify defendants of substantive claims that are different from those pleaded in the action, so tolling of the time limits applicable to those different claims does not safeguard 'essential fairness to defendants." *Id.* (quoting *American Pipe,* 414 U.S. at 553-55). Here, the Harris class asserted the same "substantive claims" as Mayer – ADA disparate treatment claims under 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6). *Id.* And Mayer's claims arise from his fitness for duty evaluation and work restrictions – a fact scenario underlying both the certified class and Mayer's declaration

---

[7] This argument has procedural, as well as substantive, shortcomings because "[o]rdinarily, a party's failure to make an argument in its opening brief results in waiver of that argument." *United States v. Cooper,* 990 F.3d 576, 584 (8th Cir. 2021). Here, U.P. did not say anything about claims being excluded in their opening brief and Mayer did not have a chance to meaningfully respond. But, for the sake of completeness the Court addresses and rejects U.P.'s argument on the merits.

in support of class certification. *Harris*, 329 F.R.D. at 620. Moreover, U.P. knew Mayer was challenging his fitness for duty determination under the ADA and that he was using a disparate treatment theory, meaning this case does not implicate the fairness concerns driving the outcome in in *Zarecor*. Overall, there is sufficient overlap between the Harris class claims and Mayer's claims here to apply American Pipe tolling.[8]

U.P. responds to the similarities by pointing to one difference. They argue that Mayer now says his 42 U.S.C. § 12112(b)(6) claim challenges a 2017 policy regarding ICDs rather than the general policy at issue in the *Harris* class litigation.[9] Mayer counters that the ICD policy is an outgrowth of the sudden incapacitation policy at issue in *Harris*. Mayer has the better of the argument. Specifically, the ICD policy is a subset of U.P.'s broader medical rules at issue in *Harris*. And, as early as 2015, U.P. understood its policy on ICDs as part and parcel with its broader policy of imposing work restrictions with those with a 1% risk of sudden incapacitation. See Filing No. 88-1 at 19 (a 2015 draft of the medical rules providing "[a] risk of Sudden Incapacitation greater than 1% per year is unacceptable for a worker in a Safety Critical Position, requiring appropriate work restriction"); *id.* at 42-43 (justifying the ICD policy in terms of the 1% sudden incapacitation rules). Moreover, the Court concluded on class certification that ICD claims – including Mayer's – were typical of the class. *Harris*, 329 F.R.D. at 625. Thus, disparate treatment

---

[8] U.P.'s primary district court authority is inapposite. *See Fulbright v. Union Pac. R.R. Co.*, No. 3:20-CV-2392-BK, 2022 WL 625082 (N.D. Tex. Mar. 2, 2022). There, unlike here, a former *Harris* class member brought a *disparate impact* claim where the class only sought certification on a disparate treatment claim, *Id.* at *5; *see also Carillo v. Union Pac. R.R. Co.*, EP-21-CV-00026-FM, 2021 WL 3023407, at *5-6 (W.D. Tex. July 16, 2021) (same).

[9] Mayer himself brought some of this confusion upon himself. Specifically, he framed his screening argument as a "new policy," but the Court understands him to be challenging the ICD subset of U.P.'s medical rules – in contrast to the plaintiffs in the cases cited by U.P. who challenged U.P.'s entire FFD scheme. And, as discussed below, it appears U.P.'s ICD policy was a subset of the larger policy at issue in the *Harris* class litigation.

claims involving ICDs were in play in the *Harris* class action. The fact that U.P. formalized the same policy between the commencement of the lawsuit and class certification does not make it fall outside the substance of the claims asserted by the class. Overall, U.P. failed to show that Mayer's claims -- which arise from the same employment action as the class action, under the same statutory section as the class action, and challenge an application of the 1% policy at issue in the class litigation – are different enough to fall outside of *American Pipe* tolling.

Mayer was a member of the *Harris* class, and his claims were asserted by the *Harris* class. So, *American Pipe* tolling applied from the date the Harris class action was filed to the date the Eighth Circuit reversed. The Eighth Circuit issued its opinion on March 24, 2020, and Mayer filed with the EEOC 38 days later – well within the 300 day deadline. So, Mayer's claims are timely and U.P. is not entitled to summary judgment.

### B. Mayer's Disability Discrimination Claim

U.P. is not entitled to summary judgment on Mayer's disability discrimination claim because a reasonable jury could find for him on each element. The ADA's "sweeping purpose" is to "eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). The ADA prohibits an employer from "discriminat[ing] against a qualified [employee] on the basis of disability." 42 U.S.C. § 12112(a). To prove a claim for disability discrimination Mayer must show: (1) he is disabled, (2) he is qualified to perform his job, and (3) U.P. discriminated against him because of disability. *Id.*; *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1060 (8th Cir. 2024).

20

### 1. Disability

The ADA allows Mayer to show that falls within the scope of the statute in three ways: (1) that he actually had a disability, (2) U.P. regarded him as having a disability, and (3) he was on record as having a disability.

### a. Actual Disability

Mayer has an "actual disability" under the ADA if his cardiomyopathy is a "physical . . . impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Physical or mental impairment means . . . [a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . cardiovascular." 29 C.F.R. § 1630.2(h). Major life activities "includes the operation of a major bodily function, including . . . circulatory . . . functions." 42 U.S.C. § 12102(2)(B). With the ADA Amendments Act of 2008, Congress made it clear that "[t]he definition of disability in this Act shall be construed in favor of broad coverage. Id. § 12102(4)(A).

A reasonable jury could conclude Mayer has an actual disability. His cardiomyopathy is a "physiological disorder" affecting his "cardiovascular" system. 42 U.S.C. § 12102(1)(A). As demonstrated by his diminished ejection fraction, this physiological condition limits his circulatory function – a "major body function." Id. § 12102(2)(B); Filing No. 61-10 (the FFD Memo indicating Mayer's "ejection [fraction] in Dec. 2015 was reported to be 45-50%, which would likely be considered sub optimal for a person with such cardiomyopathy"). Basically, the record shows that Mayer's heart functions at a level below the average population and a reasonable jury could conclude that it qualifies as an "actual disability."[10]

---

[10] A jury could certainly go the other way and decide Mayer's ejection fraction did not "substantially" limit his circulatory functioning. 42 U.S.C. § 12102(1)(A). At the time U.P. imposed work restrictions, Mayer's

In response, U.P. argues that Mayer does not consider himself disabled and is able to comfortably "walk, . . . play softball, . . . play golf, . . . [and] bowl." Filing No. 61-1 at 13, Mayer Dep. at 162:9-21. True but his cardiomyopathy affects the functioning of his circulation, "a major bodily function[]" and, "[a]n impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C); Id. § 12102(2)(B). So, the fact that Mayer is not limited in other facets of his life does not entitle U.P. to summary judgment.

### b. Record of Disability

For similar reasons, a reasonable jury could decide that Mayer was on record as having a disability. Where the "actual disability" prong looks at the plaintiff's impairment at the time of the employment decision, the "record of disability" prong looks to the past. 29 C.F.R. § 1630.2(k)(1). More specifically, "an individual has a record of a disability if the individual has a history of . . . physical impairment that substantially limits one or more major life activities." Id. Here, Mayer's medical records – available to U.P. – discuss his extensive history of cardiomyopathy. See Filing No. 70-10 (describing medical records indicating Mayer had an ejection fraction of 25 to 30% in 2005). Indeed, in 2005 his ejection fraction was low enough to require implantation of an ICD. Id. Under these circumstances, a reasonable jury could conclude Mayer had "a history of" a "physiological disorder" affecting his "cardiovascular system." 29 C.F.R. § 1630.2(k)(1); 42 U.S.C. § 12102(2)(B).

---

cardiomyopathy was "mild", and his ejection fraction floated around in the 45-50% range, Filing No. 61-17 at 2. But record evidence shows his heart's functioning was below the normal range. So, the Court cannot conclude as a matter of law that Mayer's cardiomyopathy is not an actual disability.

### c. Regarded as Disabled

Mayer is disabled under the ADA if U.P. "regarded [Mayer] as having . . . an impairment." 42 U.S.C. § 12102(1)(C). "Physical or mental impairment means . . . [a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological." 29 C.F.R. § 1630.2(h). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). An individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action. *Id.* at § 1630.2(l)(2). "To illustrate how straightforward application of the 'regarded as' prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability." 29 C.F.R. § 1630.2(l).

The FFD Memo shows that U.P. regarded Mayer has having a physical impairment. An impairment is "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . cardiovascular." 29 C.F.R. § 1630.2(h); *Sanders*, 108 F.4th at 1060. For example, in *Sanders*, evidence that U.P. "was concern[ed] that Sander's heart was impaired" was enough to show a perceived disorder affecting the cardiovascular system. *Sanders*, 108 F.4th at 1060–61. Same here. U.P. made and justified their decision with reference to Mayer's heart functioning. Filing No. 61-10 at 2 ("Although he is reported to be stable with improved ejection fraction, based on his underlying condition he is

considered to have a permeant unacceptable risk for sudden incapacitation due to a life-threatening ventricular arrhythmia or an inadvertent ICD shock."). "Based on this evidence that Union Pacific perceived [Mayer] as having a heart impairment and restricted him from work on that basis, a reasonable jury could conclude that the railroad regarded [Mayer] as being disabled." *Sanders*, 108 F.4th at 1061.

In response, U.P. raises familiar arguments. The Court dealt with them in detail recently in *Hurd v. Union Pac. R.R. Co.*. No. 8:23-cv-201, 2025 WL 713516 at *9-11 (D. Neb. Mar. 4, 2025). Suffice to say, U.P.'s position that the "regarded as" definition does not apply because the medical decision did not implicate "archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities" was specifically rejected by the Eighth Circuit in *Sanders*. 108 F.4th at 1061. More specifically, the Circuit observed the text of the ADA "provides no basis to limit the prohibition to discrimination based on 'archaic attitudes, erroneous perceptions, and myths'" and held "Dr. Charbonneau's recommendation thus does not insulate [U.P.] from liability." *Id.* And, U.P. misreads *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104 (8th Cir. 2016) as holding an employer does not regard an employee as disabled when they act based on the employee's future risk for harm. There, unlike here, the employee had no physical impairment – only a physical characteristic (obesity) correlated with future risk of developing a disabling impairment. *See Hurd*, 2025 WL 713516 at *10-11 (discussing this argument in detail).  Because Mayer has a qualifying physical impairment, U.P.'s safety concerns go to their direct threat defense – not whether they regarded Mayer as disabled. *See* 42 C.F.R. § 1630.2(l)(2) ("An individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an

24

actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.").

U.P. perceived Mayer as having a heart impairment and acted accordingly. A reasonable jury could conclude they regarded him as disabled.

*     *     *

To summarize, a reasonable jury could conclude Mayer was actual disabled, had a record of disability, and U.P. regarded him as disabled.

### 2. Qualified to Perform the Job

A reasonable jury could conclude Mayer was qualified to perform his job. The ADA only prohibits discrimination against "a *qualified* individual on the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). A qualified individual is one who possesses "the requisite skill, experience, education and other job-related requirements" of the job and "with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.1(m). Here, nobody disputes that Mayer – who worked as an engineer for many years – possessed the "requisite skill, experience, [and] education" to work as an engineer. *Id.* Nor does U.P. argue that federal regulations precluded Mayer from serving as an engineer. Nor does U.P. present any legal or physical barriers that would stop Mayer from operating a train. Thus, a reasonable jury could conclude that Mayer was a qualified individual.

Like in previous cases, what U.P. is really arguing is that Mayer could not perform his job *safely*. *See e.g.* Hurd, 2025 WL 713516 at *13 (addressing the same argument). But safety is explicitly addressed in U.P.'s statutory direct threat defense. *See* 42 U.S.C. §§ 12113(a)–(b); 29 C.F.R. Pt. 1630 app. § 1630.2(l). And -- unlike the elements of

25

Mayer's prima facie case -- U.P. has the burden of showing Mayer posed a direct threat to himself or his coworkers. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 572 (8th Cir. 2007). Basically, U.P. wants the Court to decide its direct threat defense at a more favorable stage of the analysis – not withstanding Congress's recognition of a defense that covers this exact issue. This will not do. The Court will consider U.P.'s safety arguments in the context of the direct threat defense. *See e.g., Hurd*, 2025 WL 713516 at 13; *Baker v. Union Pac. R.R. Co.*, 580 F.Supp.3d 647, 659 (D. Neb. 2022).

To summarize: a reasonable jury could conclude Mayer was a qualified individual.

### 3. Cause

A reasonable jury could determine Mayer's impairment caused U.P. to impose work restrictions. To recover under the ADA, Mayer must show that U.P. "discriminated" against him "on the basis of disability." 42 U.S.C. § 12112(a). More specifically, he must show "he . . . was subjected action prohibited under this Act *because of* an actual or perceived physical or mental impairment." *Id.* at § 12102(3)(A) (emphasis added). Cause in an ADA case can be shown directly or indirectly, using the *McDonnell Douglas* burden shifting framework. *See Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021). The key question is not whether U.P. "was hostile toward disabled persons" but rather whether U.P. "was motivated by the employee's disability." *Sanders*, 108 F.4th at 1062.

A jury could reasonably conclude U.P.'s decision to impose work restrictions "was motivated by [Mayer's] disability." *Id.* Mayer can show cause if "the defendant acknowledges relying on the plaintiff's [impairment] in reaching the employment decision." *Id. Sanders* controls. There, like here, U.P. imposed work restrictions on an employee

26

"because it believed he had diminished cardiovascular health." *Id.* Specifically, the FDD memo justified work restrictions because "based on his *underlying condition* he is considered to have a permeant unacceptable risk for sudden incapacitation due to a life-threatening ventricular arrhythmia or an inadvertent ICD shock." Filing No. 61-10 at 2 (emphasis added). Thus, U.P. said they relied on Mayer's impairment, a jury could take them at their word, and find Mayer satisfied his third element.

Once again, U.P. bristles at the idea that reliance on the risks posed by its employees' physical impairments is direct evidence of discrimination. *See e.g. Hurd*, 2025 WL 713516 at *14-15 (addressing this argument in greater detail). But "finding direct evidence here honors the bargain of the fitness-for-duty evaluation under the ADA." *Id.* The direct threat defense is unique in anti-discrimination law. When safety is at issue, it specifically allows an employer to rely on a protected trait to reach an employment decision – something that would be unheard of in a race or sex discrimination case. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 350 (5th Cir. 2019) (Costa, J., specially concurring). All the employer needs to do is a reasonable medical judgment based on about a real and substantial risk based on the best available medical information *Walmart Stores*, 477 F.3d at 571. And Mayer need not show that U.P. was prejudiced against people with disabilities or thought less of him because of his heart condition, only that it relied on his heart condition in making its employment decision. *Sanders*, 108 F.4th at 1062. Thus, analyzing this as a direct evidence case is consistent with what everyone in this case agrees: U.P. imposed work restrictions because of safety concerns stemming from Mayer's disability.[11]

---

[11] The Court remains dubious about the applicability of the indirect evidence burden shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to these railroad direct threat ADA cases. *See e.g. Hurd*, 2025 WL 713516 at *14-15; *Nall*, 917 F.3d at 350 (Costa, J., specially concurring). To the extent it applies, the Court's conclusion is the same. Mayer meets his prima facia case. *See Olson*

To summarize: a reasonable jury could conclude U.P. relied on Mayer's disability to impose work restrictions. But that reliance is legal if U.P. can show Mayer posed a direct threat to the safety of his coworkers and the public. The Court turns to that issue next.

### C. U.P.'s Direct Threat Defense

Like many U.P. "ADA cases, the hard issue in this one is not whether there was discrimination but whether that discrimination was justified." *Nall*, 917 F.3d at 350-52 (Costa, J., specially concurring). While a close call, there is enough here to go to a jury.

#### 1. Legal Framework

The direct threat defense clarifies that the ADA does not require an employer to hire or continue to employ an employee who "pose[s] a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a)–(b). But, because showing someone is a direct threat requires the employer to consider an employee's disability or impairment, Congress imposed guardrails to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Wal-Mart Stores*, 477 F.3d at 571. Specifically, to succeed on a direct threat defense U.P. must show that Mayer's condition created "a significant risk of substantial harm to the health or safety of

---

*v. Cap. Region Med. Ctr.*, 713 F.3d 1149, 1153-54 (8th Cir. 2013) (elements); *supra* Section B.1 (membership in a protected class); supra Section B.2 (qualified for the job); *supra* Section B.3 (FDD memorandum stating U.P. relied on Mayer's "underlying condition"); *supra* Section C.2 (evidence suggesting U.P. relied on stereotypes about his heart condition rather than a reasonable medical judgment). U.P.'s safety rationale relies on the risk from Mayer's condition and likely does not constitute a legitimate nondiscriminatory reason. *See* 29 C.F.R. Pt. 1630, App., § 1630.15(a) ("The crux of the defense to this type of charge is that the individual was treated differently not because of his or her disability but for a legitimate nondiscriminatory reason such as poor performance *unrelated to the individual's disability*.") (emphasis added). Even assuming the safety concerns are legitimate and nondiscriminatory, for the reasons discussed *supra* Section C, a reasonable jury could conclude it was pretextual – i.e., that U.P.'s safety judgment was wrong, and it acted on "myths and fears about disability" instead. *Sch. Bd. of Nassau Cnty., Fla. V. Arline*, 480 U.S. 273, 284 (1987). So, using the indirect approach does not change the outcome here.

the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).  The direct threat assessment must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job" and "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.*; *Sanders, 108 F.4th at 1062*.  In making this judgment, U.P. must have considered: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." 29 C.F.R. § 1630.2(r).  It is not enough for U.P. to show "slightly increased risk" or a "speculative or remote risk" when applying these factors. 29 C.F.R. § 1630.2(r).  Instead, U.P. must show Mayer "poses a significant risk, i.e., high probability, of substantial harm." *Id.*

U.P. has the burden of proving Mayer posed a direct threat. *Wal-Mart Stores*, 477 F.3d at 571–72.  "Whether one is a direct threat is a complicated, fact intensive determination, not a question of law.  To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all the evidence about the nature of the risk and the potential harm." *Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 764 (5th Cir. 1996); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1278 (10th Cir. 2015) (same).

## 2. "A reasonable medical judgment that relies on the most current medical knowledge"

There is a material in the record creating a dispute of material fact about whether U.P.'s imposition of work restrictions was "objectively reasonable" and "based on the most current medical knowledge." *Sanders*, 108 F.4th at 1062. More specifically, under the

FMCA guidelines Mayer's heart functioning alone would not bar him from serving in the analogous role of a commercial trucker. True, the FMCA Guidelines recommend no certification based on Mayer's implanted ICD. Filing No. 60-5 at 5. But, a reasonable jury could conclude – based on the 2017 Watanabe study – that the FMCA Guidelines do not represent "the most current medical knowledge" regarding the risk of incapacitation from an accidental ICD discharge. Sanders, 108 F.4th at 1062. With these considerations in mind and drawing all inferences in favor of Mayer, a reasonable jury could conclude U.P.'s decision was based on an outdated assumptions about Mayer's medical condition rather than an objectively reasonable medical judgment.

As a preliminary matter, the Court acknowledges U.P.'s safety concerns are weighty. Mayer himself admitted his job was safety critical. He was personally responsible for ensuring the safe operation of the train. Everyone agrees that a train derailment is a real and concrete risk to those on the train and in its vicinity. But, even crediting the weight of U.P.'s interest, it still must follow the guardrails put in place under the direct threat defense. Sanders, 108 F.4th at 1062.

U.P. understood the risk from Mayer's ICD in two ways. Filing No. 61-10 at 2. One, the ICD is a proxy for underlying heart failure. In other words, the fact that a cardiologist implanted an ICD indicates that the patient is at serious risk of arrythmias and cardiac death. Id. And, because the ICD responds to but does not prevent arrythmias, U.P. must account for the syncope risk posed by Mayer's underlying heart condition. See Filing No. 60-5 at 5. Two, the ICD presents second order risks. Specifically, the ICD can malfunction and deliver an inappropriate shock – incapacitating or killing the patient. Filing No. 61-9 at 2. The Court addresses each category of risk.

### a. The risk from Mayer's underlying heart condition.

A reasonable jury could conclude Mayer's heart functioning alone was insufficient to support a "reasonable medical judgment" that Mayer posed "a significant risk, i.e., high probability, of substantial harm" to his coworkers and the public. 29 C.F.R. § 1630.2(r). Here, the FMCA guidelines cover cardiac functioning in detail. Filing No. 60-5 at 7. The FMCA guidelines are evidence-based guidelines used in the commercial trucking industry. Filing No. 60-5 at 4; Filing No. 61-16 at 5. The risk profile of a commercial trucker is like that of train engineer – both are responsible for ensuring the safe operation of a multi-ton vehicle on multi-hour journeys through heavily populated areas. The FMCSA Guidelines in place at the time of the decision recommend no certification if a commercial truck driver has a left ejection fraction of 40% or lower, a history of dangerous arrythmias, or syncope. Filing No. 60-5 at 7. Here, at the time U.P. imposed work restrictions, Mayer met zero of the no certification conditions. One, his most testing showed an ejection fraction of 45% to 50%. Filing No. 70-18; Filing No. 61-10 at 2. Two, is no evidence that Mayer suffered sustained arrythmias during this period. Filing No. 70-7 at 12, Esterbrooks Dep. at 39:8-22. Three, there is no evidence that Mayer has a history of syncope associated with his heart condition. Filing No. 70-2 at 48. So, in 2017, the FMCSA guidelines would not have barred Mayer from serving as a commercial trucker – suggesting that he is similarly safe to drive a train.

Mayer's cardiology experts agree. Specifically, Dr. Esterbrooks and Dr. Goldstein opined that Mayer's improved ejection fraction corresponded to a reduced risk of life threatening arrhythmias. Filing No. 70-7 at 18, Esterbrooks Dep. at 62:4-11; Filing No. 61-17 at 1. They opine that this is tied to Mayer's reduced drinking because, as Dr. Callans

admitted, alcohol induced cardiomyopathy is "famously reversible." Filing No. 70-9 at 12, Callans Dep. at 39:12-18. Filing No. 61-17 at 1 Further supporting the improvement of Mayer's condition, his expert testified that his heart functioning in 2017 would not have qualified him for the implantation of an ICD. Filing No. 70-10 at 18; Filing No. 61-17 at 1; Filing No. 70-7 at14, Esterbrooks Dep. at 48:25-49:7. And, the fact that Mayer never received a shock from his device over a decade, indicates that his underlying heart condition was less risky than an average person with an ICD. Filing No. 61-17 at 1.[12] So, the expert testimony shows that Mayer's ICD is, at best, an imperfect proxy for the severity of his underlying heart condition.

Against this medical backdrop showing improved cardiomyopathy, a reasonable jury could conclude Dr. Holland estimate of a 20% risk of an appropriate ICD shock is overinflated and based on generalizations about Mayer's medical condition rather than an individualized review.  Overall, a reasonable jury could conclude: (1) the FMCSA cardiomyopathy standard did not bar Mayer from working as an engineer, (2) Dr. Holland's 20% syncope risk was based on generalizations about people with ICDs rather than "an objectively reasonable" medical judgment.

**b. The risk from Mayer's ICD.**

Turning to the ICD-specific risks, a reasonable jury could conclude that Dr. Holland's assessment of the risk of accidental shock by the ICD was not based on the "most current medical knowledge." *Sanders*, 108 F.4th at 1062. Specifically, the FMCSA guidelines recommend no certification for people with ICDs, in part because of their

---

[12] Of course, U.P.'s experts opine that Mayer's heart condition still creates substantial sudden incapacitation risks – even if above the 40% ejection fraction cutoff. *See e.g.,* Filing No. 61-14 at 4; Filing No. 61-16 at 8/ But, a reasonable jury could rely on the FMCSA's decision to draw the line elsewhere and disagree.

potential for inappropriate discharge. Filing No. 60-5 at 5. But the 2017 Watanabe study -- large scale event study of patients with implanted ICDs – found the syncope risk of accidental discharge was much lower than commonly assumed. Filing No. 70-8. More specifically, "a small number of patients (0.7%) experienced syncope associated with inappropriate ICD therapies, with an estimated maximum annual risk of harm that was far below the commonly cited acceptable risk threshold of 5 in 100,000." Filing No. 70-8 at 9. Based on those findings, the researchers recommended revisiting driving restrictions associated with ICD implantation. *Id.* The study was issued on July 20, 2017, between the 2015 edition of the FMCSA guidelines and Mayer's fitness for duty evaluation in August 2017. *Id.* at 2. Thus, Mayer has shown a concrete basis to conclude that would allow the jury to conclude the FMCSA ICD rule is not "most current medical knowledge."

This new study is not merely of academic interest. As discussed above, a reasonable jury could conclude Dr. Holland overstated the risk of an appropriate discharge. And, if the "best available medical evidence" showed a much lower risk from inappropriate discharge, Dr. Holland's assertion that Mayer had an additional 10% risk of incapacitation unreasonable. Overall -- considering the health of Mayer's heart in 2017 and the evolving science on accidental discharge – the chance that Mayer's heart would fail or receive a disabling shock while operating the train moves from a "likely" or "imminent" risk to a "speculative or remote risk." 29 C.F.R. § 1630.2(r). Thus, there is enough evidence to go to the jury.

*Christensen v. Union Pac. R.R. Co.*, a recent opinion from Chief Judge Rossiter, provides a useful contrast. No. 8:23-cv-268, 2025 WL 1682676 (D. Neb. May 23, 2025). There, the court concluded U.P. was entitled to summary judgment on their direct threat

defense for a train engineer with a history of seizures. *Id.* at *7. There everyone agreed that plaintiff had a heightened seizure risk and could not be certified under the FMCSA guidelines – plaintiff only argued U.P. should have been less risk adverse. *Id.* ("Beyond his criticism of Dr. Holland's interpretation of the Handbook, Christensen neither challenges the currency or quality of the evidence the HMS considered nor identifies any other specific evidence it should have reviewed.") More specifically, plaintiff failed to introduce any evidence that the FMCSA guidelines were inaccurate or not up to date. *Id.* Here, Mayer introduced the type of evidence the court found lacking in *Christensen* – concrete divergences from the FMCSA guidelines on U.P.'s part and specific subsequent studies undermining U.P.'s risk assessment. Put another way, Mayer provided more than Christensen's abstract disagreement with U.P.'s medical judgment.

Certainly, a reasonable jury could conclude that U.P. reasonably assessed Mayer's cardiac risk and the Watanabe study did not undermine the FMCSA guidance regarding ICDs. Indeed, U.P. has many strong jury arguments on direct threat. But direct threat is a "a complicated, fact intensive determination, not a question of law." *Rizzo*, 84 F.3d at 764. And there is enough evidence for a reasonable jury to go the other way. So, summary judgment is inappropriate on U.P.'s direct threat defense.

### D. Mayer's Unlawful Screening Claim

One loose end remains: Mayer's unlawful screening claim under 42 U.S.C. § 12112(b)(6). Mayer's claim and U.P.'s business necessity defense receive only cursory treatment in the briefing and the record is silent on many of the key issues. U.P. has not shown they are entitled to summary judgment on this claim.

34

Neither party engages with the legal framework for an unlawful screening claim. Under 42 U.S.C. § 12112(b)(6), disability discrimination includes "using qualification standards . . . that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity." "The purpose of this provision is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actual unable to do the job." 29 C.F.R. pt. 1630, App., § 1630.10(a). Courts analyze unlawful screening claims in two steps. First, they consider whether the qualification standard functions to screen out persons with disabilities. *See Bates v. UPS*, 511 F.3d 974, 994 (9th Cir. 2007) (en banc) *cited with approval in Harris*, 953 F.3d at 1035. Second, the burden shifts to the employer to prove their business necessity defense. To show job relatedness, U.P. must: (1) "'validate the [qualification standard] in question for job-relatedness to the specific skills and physical requirements of the sought-after position,'" and "'demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job.'" *Harris*, 953 F.3d at 1035 (quoting *Belk v. S.W. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) & *Bates*, 511 F.3d at 996). To show business necessity, U.P. "must show that" the qualification standard "'substantially promote[s] the business's needs." *Bates*, 511 F.3d at 996. When the qualification standard implicates safety, "'the court should take into account the magnitude of possible harm as well as the probability of occurrence.'" *Harris*, 953 F.3d at 1035-36 (quoting *Bates*, 511 F.3d at 996); *see also EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000) ("The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be

tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example.").

A reasonable jury could conclude that the ICD policy screens out persons with disabilities. For example, in *Bates*, the Ninth Circuit addressed application of a hearing requirement that "screened out" deaf people. *Bates*, 511 F.3d at 994. Here, the record shows that ICDs are implanted in patients with heart failure – i.e., substantially below average functioning of the cardiovascular system. Filing No. 70-6 at 8, Lowes Dep. at 22:6-16. And, as shown by Mayer's experience, some employees with ICDs are qualified to perform the engineer job but for the rule against them. See supra Section B.2. U.P. does not meaningfully address the elements of or record evidence regarding Mayer's § 12112(b)(6) claim, instead focusing on cases addressing a dispute over intent that is not relevant here.[13] So, absent meaningful opposition from U.P., Mayer has raised a fact issue as to whether the ICD policy screens out otherwise qualified individuals with cardiac disabilities.

U.P. may have a viable business necessity defense but failed to develop even a cursory argument about it in its briefing. To win on its business necessity defense U.P. must show the ICD prohibition is "job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). U.P. does not address the elements of

---

[13] U.P.'s contrary authority is not on point. Specifically, the prior cases challenged U.P.'s fitness for duty policy as whole. For a representative example, see e.g. *Brundy v. Union Pac. R.R. Co.*, NO. 8:23-CV-238, 2023 WL 6621112 at *12 (D. Neb. Oct. 11, 2023). In *Brundy*, the court determined that the fitness for duty policy was not facially discriminatory because it applied to all employees for a number of conditions that did not qualify as disabilities under the ADA. *Id.* at *12-13. Without a facially discriminatory policy, the court sallied forth, looked for indirect evidence, and found none. *Id.* at *14-16. Here, Mayer does not challenge the broader FFD program. Instead, he challenges a subset of U.P.'s medical rules -- the ICD policy. This policy only applies to employees whose hearts are bad enough to require an ICD and the record does not show a substantial population of non-disabled employees with implanted ICDs. Thus, on the current record, the ICD policy here appears to facially discriminate against those with heart conditions requiring ICDs and is, thus, distinguishable from the broader FFD policy addressed in *Brundy*.

its business necessity defense, point the Court to the portion of the record establishing those elements, or engage with any caselaw analyzing the defense. *See Torgerson*, 643 F.3d at 1042 (addressing the movant's burden on summary judgment). And, when put on notice that the Court was converting U.P.'s Fed. R. Civ. P. 12(c) motion to a Fed. R. Civ. P. 56 motion, U.P. did not submit any facts in support of a business necessity defense. Indeed, across U.P.'s 92 pages of briefing, they do not mention "business necessity" once. And, while the Court can make out the blurry contours of a safety-related argument, it is not the role of the Court to invent summary judgment arguments that are not asserted by the parties.

The parties' briefing provides only a cursory discussion of the facts and law of a § 12112(b)(6) unlawful screening claim. So, the Court cannot say U.P. is entitled to summary judgment. If Mayer wants to present this claim at trial, the Court is amendable to addressing U.P.'s business necessity defense on a Fed. R. Civ. P. 50 motion.

## CONCLUSION

Mayer's claims are timely because they were tolled during the pendency of the *Harris* class action. U.P. may permissibly rely on Mayer's heart condition to impose work restrictions if he posed a direct threat to his coworkers and the public. But a reasonable jury could conclude U.P. did not rely on "the most current medical knowledge" to make an "objectively reasonable" determination that Mayer posed this kind of direct threat. So, they are not entitled to summary judgment on Mayer's disparate treatment claim. U.P.'s limited briefing and evidence does not demonstrate they are entitled to summary judgment on Mayer's unlawful screening claim. THEREFORE, IT IS ORDERED:

1. U.P.'s Motion for Summary Judgment (Filing No. 57) is denied.

2. U.P.'s Motion for Judgment on the Pleadings (Filing No. 53) is converted to a Motion for Summary Judgment and denied.

3. Mayer's Motion for Judicial Notice (Filing No. 80) and U.P.'s Motion for Judicial Notice (Filing No. 55) are denied as moot.

Dated this 2nd day of July, 2025.

BY THE COURT:


s/ Joseph F. Bataillon
Senior United States District Judge